UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TERRY OTTO,

        Plaintiff,

v.                                                                                             Case No. 17-C-0943

NANCY A. BERRYHILL,

        Defendant.

## DECISION AND ORDER

This is an action for judicial review of a decision by the Commissioner of Social Security. Plaintiff Terry Otto challenges the decision of the Commissioner denying his application for a period of disability and disability insurance benefits (DIB) and for supplemental security income (SSI) under Titles II and XVI of the Social Security Act. He claims that the Administrative Law Judge (ALJ) erred in denying his application and that the decision is not supported by substantial evidence. Specifically, he argues that the ALJ misapplied the Social Security Administration's (SSA) special technique when evaluating his mental impairments, erred in rejecting the opinions of two physicians, articulated a Residual Functional Capacity (RFC) that was not supported by substantial evidence, and gave insufficient weight to his subjective symptoms. For the reasons that follow, the decision of the Commissioner will be reversed and remanded.

## BACKGROUND

On April 16, 2014, Plaintiff applied for DIB and SSI, alleging an onset date of March 22, 2014, due to a clubbed left foot, one leg being shorter than the other, and complications from two foot surgeries. R. 114–18. His application was denied both initially in June 2014 and on

reconsideration in July 2014. R. 115–16, 135–36. Plaintiff requested a hearing before an ALJ, and ALJ G. Ross Wheatley held a hearing on November 17, 2015. R. 42, 153. Both Plaintiff and a vocational expert (VE) testified at the hearing. R. 43.

At the time of the hearing Plaintiff was 46 years old and lived in Modesto, California, with two roommates. R. 63, 97. He graduated high school but never attended junior college or received any other formal certification, although he once investigated attending Fox Valley Technical College to become a cook. R. 47–48. Plaintiff testified that he had not worked since March 2014, when he was fired from his position as a cashier. R. 49–50. Over the preceding 15 years, he had worked primarily as a cashier. R. 48. Although after he was fired he applied for cashier positions at retail stores like Family Dollar, Dollar Tree, and Dollar General, he did not receive any calls regarding his applications. R. 50–51.

Plaintiff testified that his primary physical ailments are his clubbed foot, which he has had since birth, and back pain. R. 51. Although he had two surgeries for the foot as a child and as a teenager, he testified that after the second surgery doctors told him there was nothing more they could do for him. *Id.* At the time of the hearing, he was taking Norco for pain related to the foot, and he had previously taken tramadol for that purpose. R. 52. He had tried physical therapy, but that causes a burning pain in his leg to travel up into his back. R. 53, 55–57. Although he had been fitted with orthopedic shoes for the clubbed foot, he could afford to purchase only one shoe (rather than a pair) due to his lack of health insurance, and at the time of the hearing he was wearing slippers rather than normal shoes, which caused a burning pain on the bottom of his toes. R. 53–54. He explained that tying shoes tightly puts pressure on the bottom of his foot, his ankle, and the pins surgically embedded in his foot, causing the pain. R. 71–73. The fact that one leg is shorter than

2

the other also exacerbates his back pain. R. 74. One medical provider had asked whether he had considered having the clubbed foot amputated, but he said he did not want to do that. R. 57.

Plaintiff testified that pain in his feet, leg, and back affected him while working. For safety reasons, his employers required him to wear his slip-resistant shoes tightly tied, but that caused pain in his feet. R. 54. While working as a cashier, he was required to stand, so he leaned against his workstation while standing to relieve the pressure on his left foot. R. 69. At least one job allowed him to switch between sitting and standing as needed. R. 69. When the ALJ asked whether he could perform a cashier job where he could alternate between sitting and standing, he waffled, saying it depended on whether his back was hurting. R. 69. If he were to perform a job that required him to sit in one position for two hours at a time without standing, he thought he would need to stand for 5 to 10 minutes at a time on 5 or 6 occasions. R. 76–78.

With regard to his depression and anxiety, Plaintiff testified that he has seen a psychiatrist and been prescribed Paxil. R. 58. He said that he sometimes becomes nervous when required to approach people and speak with them, but the medication helped that anxiety. R. 59. As a coping method for the anxiety and depression, he testified that his psychiatrist has taught him breathing techniques, and he said that he tries to "keep calm" to control his depression. R. 60.

Plaintiff also testified regarding the effect that his foot, leg, and back pain have on his daily activities. When he goes shopping with his roommates, he testified, he needs to sit down due to back pain after only 15 to 30 minutes, so he returns to the car. R. 61. However, he is capable of taking a shower, getting dressed, and making his bed on his own, and he can boil water, use a microwave, prepare eggs, and make a sandwich, although he said that he generally does not cook. R. 63. Waking up in the morning, it takes him about 5 to 10 minutes to get his foot stable before he can

walk, and there have been occasions when the pain in is foot is so bad he cannot stand. R. 75–74. Around the house, he can help put dirty dishes in the dishwasher, but he can only load the top rack because bending to reach the bottom hurts his back. R. 64. He does not take out the trash, and his roommate does his laundry, folds it, and puts it away. *Id.* At home, he does not read books or magazines, but he has an iPad and cell phone, uses email and Facebook, and watches "a lot" of TV. R. 64–65. He has a driver's license, but due to back pain he drives only rarely, such as for nearby doctor's appointments or prescription pickups, and his roommates mostly drive him places. R. 66–68. Before moving to California, he took the bus sometimes, too. R. 68. He would like to go to church more often, but he finds the church environment is not conducive to his need to frequently switch between sitting and standing. R. 68.

In a thirteen-page decision dated December 23, 2015, the ALJ determined that Plaintiff is not disabled. R. 25–37. The ALJ's decision followed the five-step sequential process for determining disability prescribed by the Social Security Administration (SSA). R. 26–27. At step one, the ALJ concluded that Plaintiff has not engaged in substantial gainful activity since his March 22, 2014 alleged onset date and that he met the insured status requirement though December 21, 2019. R. 27. At step two, the ALJ concluded that Plaintiff has one severe impairment: clubfoot, status post-two surgeries. *Id.* At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 30. With regard to his physical impairment, the ALJ considered listing 1.02 (major dysfunction of a joint). *Id.*

The ALJ next assessed Plaintiff's RFC and found that he can perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), subject to several limitations:

> The claimant can stand or walk for 6 hours during an 8 hour work day, sit for approximately 6 hours during an 8 hour work day, with normal breaks. The claimant should have no forceful pushing and pulling with the left lower extremity. The claimant may occasionally climb ladders, ropes, and scaffolds, and may occasionally crouch. The claimant may frequently climb ramps and stairs, and may frequently stoop, kneel, and crawl. The claimant requires the opportunity to alternate between sitting and standing at will so long as the claimant is not off work task for more than 10 percent of the workday.

R. 30. In support of the RFC finding, the ALJ provided a five-page discussion of Plaintiff's testimony and medical records, which expanded on a two-page analysis of his records conducted at step three. R. 27–35. At step four, the ALJ then concluded, based on testimony by the VE, that Plaintiff is capable of performing his past relevant work as a cashier or sales clerk. R. 36. Accordingly, the ALJ found that Plaintiff is not disabled. *Id.* The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. R. 7.

## LEGAL STANDARD

The statute authorizing judicial review of decisions of the Commissioner of Social Security states that the findings of the Commissioner "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is "such relevant evidence as a reasonable mind could accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (quoting *Richardson v. Perales*, 404 U.S. 389, 401 (1971)). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and his conclusion. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v.*

*Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

**ANALYSIS**

Plaintiff argues that this court should reverse the ALJ's decision for four reasons. First, he contends that the ALJ erred in applying the SSA's special technique when assessing the severity of his depressive disorder and anxiety disorder. Second, he contends that the ALJ improperly rejected the opinions of two medical professionals who examined him. Third, he contends that the ALJ failed to adequately identity the evidence that supported his RFC finding. Finally, he contends that ALJ improperly evaluated his subjective statements regarding his disabling symptoms.

**A. Application of the Special Technique**

Plaintiff begins his argument by contending that the ALJ misapplied the SSA's special technique when evaluating the severity of the functional restrictions caused by his depressive disorder and anxiety disorder. At step two of the five-step sequential evaluation process, the SSA determines whether the claimant has an impairment, or combination of impairments, that is "severe," meaning it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). To evaluate the severity of mental impairments at step two, the SSA uses what it calls its "special technique." *Id.* § 404.1520a. The special technique allows the SSA to "(1) [i]dentify the need for additional evidence to determine impairment severity; (2) [c]onsider and

6

evaluate functional consequences of the mental disorder(s) relevant to [the claimant's] ability to work; and (3) [o]rganize and present [its] findings in a clear, concise, and consistent manner." *Id.* § 404.1520a(a).

The special technique requires first an evaluation of the claimant's pertinent symptoms, signs, and laboratory findings[1] to determine whether he has a medically determinable mental impairment. *Id.* § 404.1520a(b)(1). If a mental impairment is found, the SSA then rates the degree of functional limitation resulting from it in four broad functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. *Id.* § 404.1520a(c)(3)–(4). These four functional areas comprise paragraph B criteria for the mental impairment listings. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00 Mental Disorders. The degree of limitation in the first three areas is rated on a five-point scale: none, mild, moderate, marked, or extreme. The degree of limitation for episodes of decompensation is rated on a four-point numerical scale: none, one or two, three, four or more. *Id.* § 404.1527(c)(4). These ratings are then used to determine whether the mental impairment is "severe." If a claimant has had no episodes of decompensation and the first three functional areas are rated none or mild, then the SSA generally concludes that the claimant does not have a severe mental impairment. *Id.* § 404.1520a(d)(1).

Although the ALJ acknowledged at step two that Plaintiff has the medically determinable

---

[1] The Social Security regulations distinguish between symptoms, signs, and laboratory findings. 20 C.F.R. § 404.1529. Symptoms—such as pain, fatigue, shortness of breath, weakness, or nervousness—are the claimant's own description of his impairments. *Id.* § 404.1529(a)–(b). "Signs are anatomical, physiological, or psychological abnormalities which can be observed, apart from [the claimant's] statements (symptoms)." *Id.* § 404.1529(b). Signs are shown by medically acceptable clinical diagnostic techniques. *Id.* Laboratory findings are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques, such as chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (x-rays), and psychological tests. *Id.* § 404.1528(c).

mental impairments of major depressive disorder and anxiety disorder, he nonetheless concluded that they were not severe, either alone or in combination. Plaintiff objects to the ALJ's finding that his mental impairment was not severe, noting that the ALJ reached the conclusion that he had only mild limitations in the broad functional areas without the benefit of any input from a mental health professional. Pl.'s Br., ECF No. 11, at 9–10. Plaintiff also argues that the finding of a medically determinable mental impairment of "major depressive disorder and anxiety disorder" is inconsistent with a finding of only mild limitations. *Id.* (citing *O'Connor-Spinner v. Colvin*, 832 F.3d 690, 697–98 (7th Cir. 2016))

The Commissioner denies that any error was committed, first questioning whether Plaintiff even established the existence of a medically determinable mental impairment. Mem. In Supp. Of Comm'rs Dec., ECF No. 15, at 3. Noting that the regulations in effect at the time of the ALJ's decision "provided that a 'mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your symptoms'" and that "only an 'acceptable medical source,' such as a medical doctor, could establish the existence of a medically determinable impairment," the Commissioner contends that "the ALJ cannot have erred in evaluating the putative limitations caused by anxiety or depression if Plaintiff failed to establish that they were medically determinable impairments." *Id.* (quoting 20 C.F.R. § 404.1508 and SSR 96-2p).

The problem with the Commissioner's threshold argument is that the ALJ did find that Plaintiff suffered from a "medical determinable mental impairment of major depressive disorder and anxiety disorder," and then proceeded to determine its severity. R. 28. Having determined that Plaintiff did have a medically determinable mental impairment, it was incumbent upon the ALJ to determine its severity by applying the special technique described above. This, the ALJ proceeded

8

to do, but because Plaintiff had not alleged a mental impairment in his initial applications, there was nothing in the record, other than reports from Sandra Centero, a Licensed Clinical Social Worker, and Aaceli Moya Vigil, an Assistant Social Worker, neither of which was an acceptable medical source. Ms. Centero completed a Mental Residual Functional Capacity Assessment (MRFCA) form in which she opined that Plaintiff's depression, anxiety, and panic attacks "moderately and markedly impaired functioning in social, occupational, and interpersonal relations." R. 29. While the ALJ was not required to accept Ms. Centero's opinion, since she was not an acceptable medical source, there was no other medical opinion in the record concerning the severity of the medically determinable mental impairment the ALJ had found.

Typically, when an applicant claims a mental impairment, the agency's medical or psychological consultant will complete a Psychiatric Review Technique Form (PRTF) and assess the severity of the impairment before the case reaches an ALJ. 20 C.F.R. § 404.1520a(e)(1); *see, e.g., Villano v. Astrue*, 556 F.3d 558, 561 (7th Cir. 2009); *Young v. Barnhart*, 362 F.3d 995, 999 (7th Cir. 2004). But because Plaintiff's initial application claimed only a physical impairment, the state-agency physicians who reviewed his file evaluated only the effect of physical impairments on his ability to work. Having rejected the opinion and reports of Ms. Centero and Ms. Vigil, the ALJ provided his own assessment of the severity of the mental impairment he had found without any medical evidence in the record. This was error.

The SSA's regulations provide that medical expertise is required to assess the severity of a mental impairment using the Special Technique. A State agency disability examiner may assist in preparing the form at the initial consideration or rehearing level, but "our medical or psychological consultant must review and sign the document to attest that it is complete and that he or she is

9

responsible for its content, including the findings of fact and any discussion of supporting evidence." 20 C.F.R. § 404.1520a(e)(1). At the hearing before the ALJ, "the written decision must incorporate the pertinent findings and conclusions based on the technique." *Id.* § 404.1520a(e)(4). If the ALJ "requires the services of a medical expert to assist in applying the technique but such services are unavailable, the administrative law judge may return the case to the State agency or the appropriate Federal component . . . for completion of the standard document." *Id.* § 404.1520a(e)(5). No medical opinion was sought by the ALJ to assess the severity of the mental impairments he found.

Although an applicant for disability benefits bears the burden of proving that she is disabled, an ALJ may not draw conclusions based on an undeveloped record and "has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable." *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004); *see also Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009); *Smith v. Apfel*, 231 F.3d 433, 437–38 (7th Cir. 2000); 20 C.F.R. § 404.1545(a)(3) ("[B]efore we make a determination that you are not disabled, we are responsible for developing your complete medical history . . . ."). That was not done here, and I am unable to determine that the failure to properly evaluate Plaintiff's mental disorder was not prejudicial. Accordingly, remand is required.

**B. Medical Opinion Evidence**

Plaintiff next argues that the ALJ erred in evaluating the opinions of two medical providers contained in the record: Dr. Wing, a podiatrist, and Joshua Clements, a Physician Assistant (PA). The regulations in force at the time Plaintiff filed his claim separated medical evidence into two categories: "acceptable medical sources" and "other sources." Acceptable medical sources were limited to licensed physicians, licensed or certified psychologists, licensed optometrists, licensed

10

podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a). "Other sources" included other medical sources such as nurse practitioners and physicians' assistants. *Id.* § 404.1513(d). Under the previous regulations, only "acceptable medical sources" could give medical opinions and be considered treating sources. *Id.* § 404.1527(a)(2); SSR 06-3p. However, an ALJ could rely on opinions from other medical sources to determine the severity of a claimant's impairments and the extent of any limitation on the claimant's ability to work. 20 C.F.R. § 404.1513(d).

In deciding how much weight to give to medical sources, an ALJ used the same kinds of factors to evaluate "other medical sources" as to evaluate acceptable medical sources. 20 C.F.R. § 404.1527(c); SSR 06-3p. Those factors included whether the source had an examining relationship with the claimant; the scope of any treatment relationship between the claimant and the source; the consistency of the source's opinion with the medical record as a whole; whether the source is a specialist; and any other factors the claimant suggests may be relevant. 20 C.F.R. § 404.1527(c)(1)–(6). SSR 06-3p explains that "the adjudicator generally should explain the weight given to opinions for these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."

Plaintiff first argues that the ALJ improperly discounted Dr. Wing's opinions regarding Plaintiff's functional limitations, particularly her opinions about limitations on his ability to lift and carry particular weights. Dr. Wing examined Plaintiff during an office visit for a podiatry consultation on November 21, 2014. R. 390–92. Her physical exam of Plaintiff's left foot and ankle showed 2/5 strength of his extensor tendons, no movement to the ankle joint due to his

previous ankle fusion surgery, and medical prominence with TTP along the posterior tibial tendon. R. 391. She opined that, "[d]ue to his deformity, he cannot bear weight, stand, or walk" on the left leg. *Id.*

Following her examination of Plaintiff, Dr. Wing completed a RFC Questionnaire. R. 284–86. She checked a box indicating that she thought that, during an 8-hour workday, Plaintiff would need to lie down more often than during a 30-60 minute lunch and two 15 minute breaks. R. 284. She indicated that, although she thought he could sit for 60 minutes at a time and 8 hours in an 8-hour workday, she also thought that he could only stand or walk for 10 minutes at a time and for 0-1 hours in an 8-hour workday. *Id.* Relatedly, she checked a box indicating her opinion that he would need a job that would permit him to shift positions between sitting and standing. *Id.* At most, she opined, he could occasionally lift less than 10 pounds. R. 285. Overall, therefore, she concluded that he is not physically capable of working an 8-hour day for 5 days a week on a sustainable basis. *Id.*

The ALJ assigned little weight to Dr. Wing's opinions, explaining that "this assessment was not based on any physical exam or diagnostic studies" and that she "was not a spine orthopedist, and thus, could not offer an opinion on weight limitations." R. 33. Elsewhere the ALJ elaborated:

> [Claimant] saw a foot doctor one time who said "disabled." This doctor did no tests. There were no foot X-rays, and no Magnetic Resonant Imaging (MRI) or Computer Tomography (CT) scans of the foot. Also, [she] limited the claimant to lifting and carrying less than 10 pounds. This doctor was not an orthopedic specialist, but rather a foot doctor. There were no objective findings to support the weight limitations.

R. 35. As the Commissioner concedes, there can be no doubt that the ALJ's observation that "this assessment was not based on any physical exam" is clearly inconsistent with the record, which includes Dr. Wing's treatment notes for her examination of Plaintiff. R. 390–92. Setting aside that

12

error, the Commissioner argues there is still substantial evidence in the record to support the ALJ's assignment of little weight to Dr. Wing's opinion.

That is too significant an error to set aside. The fact that Dr. Wing, a podiatrist, conducted a physical examination before issuing her opinion is significant and must be considered by the ALJ in weighing her testimony. This does not mean the ALJ must therefore accept her opinion, but he should reweigh it in light of this important consideration. For this reason too, the case will be remanded.

Plaintiff's arguments regarding PA Clements are less strong. Clements completed an assessment form on April 15, 2015, diagnosing Plaintiff with fatigue, inability to concentrate, club foot deformity, and low back pain. R. 306. Clements opined that Plaintiff had only a "fair" prognosis, but he also characterized the disability as temporary and likely to last only into June 2015. *Id.* Indeed, Clements opined that Plaintiff would be capable of working full-time and that there was no reason he could not work outside the home, although he would not be capable of participating in agricultural work. *Id.* The form also included Clements' opinion that Plaintiff "[m]ust be able to take frequent breaks and change position often due to foot pain and low back pain" and that "[t]hings that require concentration" would be the only type of tasks that Plaintiff could not perform. *Id.*

The same two-page record exhibit that contains Clements' April 2015 physical capability assessment also includes a nearly identical form completed in May 2015. R. 305. The identity of the completing medical provider is unclear, as there is nothing written in the space labeled "Doctor's Name" and the signature is illegible, although a stamp provides the address for the Golden Valley Health Center. *Id.* The handwriting does not appear to match the handwriting on Clements' April

2015 form. *Id.* The unnamed medical source assessed Plaintiff as having a poor prognosis, being permanently disabled, unable to work full- or part-time, unable to work outside the home, unable to perform tasks that involve walking, and likely to have difficulty ambulating due to foot and ankle deformity. *Id.* The ALJ apparently attributed this assessment to Clements as well. R. 34.

As a physician assistant, Clements was an "other source" under the regulations in force at the time Plaintiff filed his claim, meaning Clements' opinion could be used to establish the severity of an impairment but not its existence. *See* 20 C.F.R. § 404.1513(d)(1). The ALJ therefore assigned little to no weight to his opinion because he was not an acceptable medical source and "[h]is assessment was inconsistent with the claimant's activities of daily living such as driving and shopping." R. 34. To the extent that the ALJ attributed the May 2015 opinion of the unidentified provider to Clements, there was substantial evidence in the record to support the ALJ's rejection of the assessment of Plaintiff as having a permanent disability so severe that he would be completely unable to work outside the home. Plaintiff's own testimony that his ability to work a job that allowed him to switch between standing and sitting would depend only on back pain undermines this anonymous assessment of total disability. What is more, the April 2015 opinion clearly belonging to Clements—that Plaintiff's disability is temporary and that he can work outside the home full-time—would not help Plaintiff's claim that his physical impairments are so severe as to be entirely disabling. R. 306. Indeed, Clements' opinion that Plaintiff "[m]ust be able to take frequent breaks and change positions often" is entirely consistent with the ALJ's RFC limitation recognizing that Plaintiff "requires the opportunity to alternate between sitting and standing at will so long as [he] is not off work task for more than 10 percent of the workday." R. 30, 306.

## C. Remaining Claims

Plaintiff also challenges the ALJ's assessment of his RFC and evaluation of his credibility. Since the case must be remanded on other grounds that may impact both issues, there is no need to resolve either at this time. The ALJ would nevertheless do well to consider Plaintiff's arguments on remand so as to guard against any error that could delay final resolution of the case.

## CONCLUSION

For the reasons given above, the decision of the Commissioner is **REVERSED AND REMANDED** pursuant to 42 U.S.C. § 405(g), sentence four for further proceedings consistent herewith. In particular, the existence and severity of Plaintiff's mental impairment(s) should be reassessed and the medical opinions reconsidered. The Clerk is directed to enter Judgment accordingly.

**SO ORDERED** this 28th day of September, 2018.

s/ William C. Griesbach  
William C. Griesbach, Chief Judge  
United States District Court